STATE OF CONNECTICUT *v.* WILLIAM HENRY
(9502)

O'CONNELL, FOTI and LAVERY, Js.

Argued February 10—decision released May 12, 1992

*Derby F. Anderson,* special public defender, for the appellant (defendant).

*Marjorie Allen Dauster,* deputy assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, and *Rosita Creamer,* senior assistant state's attorney, for the appellee (state).

FOTI, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of the crime of manslaughter in the first degree with intent to cause serious physical injury, in violation of General Statutes § 53a-55 (a) (1).[1] The defendant claims that (1) prosecutorial misconduct at trial and at the sentencing hearing deprived him of his constitutional right to a fair trial under the due process clauses of the state and federal

---

[1] The defendant was charged with the crime of murder in violation of General Statutes § 53a-54a, but convicted of the lesser included offense.

constitutions,[2] and (2) the trial court improperly admitted prejudicial hearsay evidence. We affirm the trial court's judgment.

The facts, as relevant to the appeal, are as follows. On June 27, 1988, the defendant, William Henry, argued with Henry Louis Manson at the apartment they shared. Also present at the apartment was a third man, Barry Isaac. The defendant stabbed Manson eight times with a butcher knife and Manson fled into the bathroom where he died. The defendant asked Isaac to call an ambulance. The defendant then left the apartment, hiding the knife behind the carpet on a riser of the staircase between the second and third floors. He then went to a telephone booth and, after calling his sister, called the police to report the incident. After his arrest and transport to police headquarters, Henry gave a statement to the police describing the stabbing.

At trial, the defendant offered a defense that he was under extreme stress because of a history of violence in his relationship with Manson, which he said resulted in numerous fights. He claimed that Manson had threatened him with a pistol and that he feared Manson.

During his direct examination, Isaac testified that when he heard Manson scream he turned and witnessed the stabbing. He indicated that he did not hear anything Manson said other than the scream. During his cross-examination, defense counsel gave Isaac a copy of a written statement he had given to the police on the night of the stabbing to refresh his recollection. That statement indicated that Isaac had heard Manson say to the defendant, "Why do you always pull that knife out on me, can't you do anything without that knife?" Isaac's cross-examination dealt with facts unrelated to this question.

[2] The defendant offers no separate analysis of his claim under the state constitution. Thus, we deem this claim abandoned and we decline to review it. *State* v. *Negron,* 221 Conn. 315, 321 n.7, 603 A.2d 1138 (1992).

On cross-examination of the defendant, the state inquired whether Manson had asked this question. The defendant responded that he did not recall Manson's saying that. After the prosecution asked whether he had ever threatened Manson with a knife prior to the stabbing, the defendant stated that he had once pulled a butter knife on Manson. Defense counsel did not object.

Peter Zeman, a psychiatrist who testified as an expert witness on the defendant's behalf, indicated that the defendant suffered from alcohol dependence, cocaine dependence, marihuana abuse and self-defeating personality traits. It was his opinion that the defendant was under extreme stress at the time of the stabbing, and was agitated, distraught, hysterical, and fearful for his own safety. He based his conclusion on five interviews with the defendant, the police reports and statements, the autopsy report, the defendant's medical history and other documents given to him by the defendant's attorney. The state cross-examined Zeman extensively about the factual basis of his conclusion as to the defendant's state of mind at the time of the stabbing. Zeman acknowledged that although he was aware that there was a witness to the stabbing, he made no attempt to interview him. The prosecution asked Zeman to what extent he had challenged the defendant's version of the incident by comparing it to inconsistent facts contained in Isaac's written statement. Zeman was asked, "And didn't Barry Isaac say in his statement that he heard Louis [Manson] say to the defendant while they were arguing 'you can't do anything without that knife, why do you always pull it out on me?' " The defendant objected on the ground that Isaac did not testify to this fact. The following colloquy took place:

"State's Attorney: I'm questioning the doctor about his knowledge at the time.

"The Court: The doctor has indicated [a] two page statement that he used in coming to his opinion and evaluation, however, I caution counsel, unless this is in Barry Isaac's statement, it [is] improper. He is—unless it's been in evidence.

"State's Attorney: Well, Your Honor, I don't know how I can cross-examine the doctor about how he used the information that he had. I'm perfectly willing—I'll offer it into evidence. I have no objection. I offer it at this time.

"Defense Counsel: Your Honor, I object, it's hearsay to the claim. It's not being offered for the truth of the matter.

" The Court: It's not being used as hearsay. It's being used, in part, for the doctor forming his opinion. Correct by the virtue of representation of counsel, I'm going to overrule the objection.

"Defense Counsel: Exception.

"The Court: Exception may be noted.

"State's Attorney: I offer this as state's exhibit F, Your Honor.

"The Court: Well, why don't we get the doctor's answer first?"

The state did not offer Isaac's written statement as an exhibit following the answer given by the witness.

The state also asked Zeman to what extent he had questioned the defendant about previously cutting Manson with a knife. Zeman recalled that on August 7, 1989, he had asked the defendant whether in the past he had ever threatened Manson with a knife, and that the defendant had told him that on one prior occasion, or perhaps more, the defendant had grabbed a butter knife. The state then asked the witness:

"Q. All right, you were aware that though according to Barry Isaac's statements that Mr. Manson said to him you can't do anything without that knife; why do you always pull it out on me?

"A. That's right.

"Q. And what is your understanding of what a butter knife is, by the way?

"A. A butter knife is usually a small knife, not sharp on the edge, that may have a rounded point on it, depending upon the type of butter knife.

"Q. Would you look at [the murder weapon] Dr. Zeman, and tell me if that purports with your understanding of what a butter knife is?

"A. No, it does not."

The defendant did not object to this use of Isaac's written statement or Isaac's allegation regarding Manson's question.

Zeman also explained under cross-examination that he scheduled a final interview with the defendant for March 21, during the trial, to discuss the incident with the butter knife, among other things. Zeman said that this topic was on his list because, in his notes of a previous interview, he had seen the reference to an incident with the butter knife, and wanted to clarify whether the defendant had ever used the larger knife. Zeman testified that he recalled from reading Isaac's written statement that Isaac heard the victim accuse the defendant of always using a knife to threaten him. The defendant did not object to this testimony or to any use of Isaac's written statement to cross-examine Zeman as to the basis of his opinion. The defendant did not request an instruction limiting the use of Isaac's written statement or Isaac's allegation regarding Manson's question. Isaac's written statement was not offered as an exhibit at trial.

The state also challenged the basis of the expert's opinion by questioning him about the absence of injuries to the defendant in light of the defendant's claim that he and the victim grappled for the knife. The state questioned Zeman as to the number of stab wounds as an indication of the defendant's intent to kill, the causes of the defendant's stress other than the defendant's relationship with the victim, and whether knowledge of the defendant's prior crimes and false statements and inconsistent statements to prison authorities about his drug use and education affected Zeman's assessment of the defendant's credibility.

On redirect examination, Zeman stated that his opinion was not changed by "information that was contained in Mr. Isaac's statement that [he had] reviewed."

In her closing argument, the assistant state's attorney summarized the testimony of the witnesses. She limited her summary of Isaac's testimony to his in-court testimony and did not refer to the question allegedly asked by Manson that was contained in Isaac's written statement. As part of the summary of the defendant's testimony, the assistant state's attorney made the following statement: "He claims he don't remember if Louis [Manson] said anything at the time of the stabbing, and we asked him didn't Louis say you can't do anything without that knife, why do you always pull it out on me. He doesn't remember the—he says, well, he might have pulled a butter knife on Louis once before and that would explain that statement. I ask you if Louis would say you always pull that knife out on me being confronted with this knife when the last time or prior occasion the knife might have been a butter knife?"

The state also discussed Zeman's testimony challenging the basis of the expert's opinion. The assistant state's attorney made the following statement:

"An example of doctor's unquestioning acceptance of the defendant's version is the defendant's account of the night of the stabbing, the description of the argument that preceded it, the fact that he didn't participate in the argument at first, that Louis [Manson] was threatening to hurt him with his fists, that Louis [Manson] physically grabbed the defendant and that both grabbed the knife. The doctor did not check what the defendant said against Barry Isaac's statement about the arguments for the factual details and any striking by Louis [Manson]. He didn't check it again against the autopsy report, against the hospital records for the times or against the fact that the defendant received no injuries, or against what Detective Dakin said in his report defendant told him—he would just accept unquestioningly what the defendant told him."

The assistant state's attorney made no other reference to Isaac's written statement or to the question allegedly asked by Manson.

When summarizing the testimony of the medical examiner, the assistant state's attorney stated that intent could be inferred from the number, depth, orientation and location of the stab wounds.

In the defendant's closing argument, defense counsel referred to Isaac's written statement when he discussed the basis of Zeman's opinion; he did not refer to Manson's alleged question about the knife when he summarized Isaac's in-court testimony.

In its charge to the jury with respect to expert witnesses, the trial court listed Isaac's written statement as one of the items on which Zeman relied. The defendant did not object or except to this portion of the jury charge.

The defendant claims that five separate instances of prosecutorial misconduct occurred during the course

of the trial, including the use of inadmissible evidence after a warning by the court, two subsequent uses of Isaac's allegation regarding Manson's question during cross-examination of Zeman, reference to the question about the knife during closing argument and reference to that question at the sentencing hearing.[3]

During the presentation of the defense, the trial court received a note from a juror. The jury was excused, and the juror was called into the courtroom. The juror testified that she had noticed that the assistant state's attorney sometimes had "sort of a disdainful expression directed toward the defense and I know it's theatrics and I know, being a law student and having gone through mock trials and stuff like that, it's probably part of the game, I just think probably the other jurors would take that adversely, and as a reflection on defense counsel's ability, I don't think it's—I just thought—I brought it up because I was concerned." The juror stated repeatedly that the expressions would have no effect on her ability to deliberate impartially, and that she had come forward only out of her concern about the effect on the other jurors. She also stated that she had not discussed her concerns with the other jurors. The trial court instructed her that she was to decide the case solely on the evidence presented at trial, and that any facial expressions of counsel or the court were not evidence.

After the juror left the courtroom, the defense counsel and the trial court stated for the record that neither had witnessed any disdainful facial expressions by the assistant state's attorney. The defendant did not at this time or later in the trial request any additional limiting or curative instructions.

---

[3] At the sentencing hearing, the assistant state's attorney, in summarizing the evidence of the crime to the judge, stated that a witness had said that the victim stated that the defendant could not do anything without the knife. The defendant does not claim that the sentencing was improper.

The claims of prosecutorial misconduct are not properly preserved. The defendant seeks review solely under *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989).[4] An unpreserved prosecutorial misconduct claim is not reviewable if the claimed misconduct consisted of isolated and brief episodes, did not reveal a pattern of conduct repeated throughout the trial, or conduct that was not blatantly egregious. *State* v. *Tweedy,* 219 Conn. 489, 509, 594 A.2d 906 (1991).

The first five instances of claimed prosecutorial misconduct are merely evidentiary matters and cannot be claimed to establish a violation of fundamental constitutional rights. Nor does the defendant's claim of prosecutorial misconduct regarding disdainful facial expressions by the assistant state's attorney warrant review. The record does not establish a pattern of conduct repeated throughout the trial or blatantly egregious conduct that deprived the defendant of a fair trial. *State* v. *Whitfield,* 21 Conn. App. 622, 628–29, 575 A.2d 1046, cert. denied, 216 Conn. 808, 580 A.2d 66 (1990). Accordingly, we decline to review these claims of error.

The defendant next claims that the trial court improperly admitted prejudicial hearsay evidence by allowing into evidence Isaac's statement through Zeman's testimony. We find no merit to this claim. Information on which an expert relied that is not offered for its truth but is offered to show that the expert relied on it is not hearsay and may be the subject of proper cross-examination to test the basis of that expert's opinion.

---

[4] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional error beyond a reasonable doubt." *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

A statement offered "for the truth of the facts contained therein . . . would [be] inadmissible, unless [it] fell within an exception to the hearsay rule." *State* v. *Alvarez,* 216 Conn. 301, 310, 579 A.2d 515 (1990). If offered not for the truth of the matter asserted, but rather for some other purpose, it is not hearsay. *State* v. *Hull,* 210 Conn. 481, 498–99, 556 A.2d 154 (1989). Isaac's statement was introduced not for its truth but to show the basis of Zeman's expert opinion. Therefore, it was not hearsay and was properly admitted.

The judgment is affirmed.

In this opinion the other judges concurred.