STATE OF CONNECTICUT *v.* EUGENE
ALPHONZO BRYANT
(AC 27581)

Bishop, Lavine and Pellegrino, Js.

Argued November 29, 2007—officially released February 26, 2008

*Auden Grogins*, special public defender, for the appellant (defendant).

*Timothy F. Costello*, deputy assistant state's attorney, with whom, on the brief, were *Michael L. Regan*, state's attorney, and *Lonnie Braxton II*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Eugene Alphonzo Bryant, appeals from the judgment of conviction, rendered after a jury trial, of possession of narcotics in violation of General Statutes § 21a-279 (a). On appeal, the defendant claims that (1) the trial court improperly admitted evidence of irrelevant, uncharged misconduct and bad character, and (2) the prosecutor's repeated impropriety deprived him of a fair trial. We affirm the judgment of conviction.

The jury reasonably could have found the following facts. On June 21, 2004, Michael Meehan, a New London police officer, was working as an undercover agent for the vice intelligence unit. During the afternoon, Meehan was sitting in an unmarked police vehicle overlooking the parking lot of a Citgo gasoline station and convenience store near Williams Street, watching the pay telephones in the parking lot. Meehan observed a Caucasian woman, Carli Star Rolfe, standing by the telephones when a blue motor vehicle operated by a black male approached. The man, later identified as the defendant, spoke to the woman and then drove away.[1]

Meehan saw the defendant return to the Citgo parking lot, park his vehicle and enter the convenience store. When he emerged from the store, the defendant was carrying a Chore Boy copper scouring pad. He reentered the vehicle, drove it to a parking space facing a concrete wall behind the pay telephones and again spoke to Rolfe, this time showing her a substance wrapped in a paper towel. Rolfe entered the passenger's side of the vehicle. Meehan watched the defendant tear off a piece of the scouring pad and stuff it into a tube. The defendant then took something off the dashboard of the vehicle and put it in the tube. Meehan saw the defendant pass the tube to Rolfe. She put one end in her mouth while the defendant flicked a lighter at the other end.

Meehan, intent on making an arrest, called his partner, Scott Jones, for backup. Dressed in plain clothes,

---

[1] According to Rolfe, the defendant asked her if she was a "hooker" and if she would sleep with him for drugs. Rolfe told the defendant that she was not a prostitute and directed him to Crystal Avenue for such services. The defendant left but returned to ask Rolfe a second time to go with him. Rolfe declined once again. The defendant then showed her a substance in a paper towel and told her that he had just "cooked it up." The defendant asked Rolfe if she wanted some and if he could use her cigarette lighter. Rolfe decided to let the defendant use her lighter and entered his vehicle from the passenger side door. She left the door open as she sat in the vehicle.

Meehan walked toward the defendant's vehicle. As Meehan approached the vehicle, the defendant got out the passenger's side door, leaped over the concrete wall and ran up a steep bank heavily covered with vegetation. Meehan ordered the defendant to stop and identified himself as a police officer. The defendant did not stop but ran so fast that his shoes came off. Meehan lost sight of the defendant and requested the assistance of a canine tracking unit. While the police waited for the canine unit, they traced the license plate of the vehicle being used by the defendant. The owner of the vehicle said that the defendant had the car. A police search of the defendant's name revealed that he was wanted on two warrants for misdemeanor failures to appear.

Police Officer Chad Stringer and his canine partner arrived at the Citgo parking lot. The canine picked up the defendant's scent and led the police up the embankment and eventually to the front door of a house at the corner of Terrace Court and Grove Street. The door to the house was locked. The canine briefly lost the defendant's scent but picked it up again and tracked it to a vehicle parked in a driveway off Terrace Court. Inside the vehicle, the police officers found the defendant barefoot, lying on the floor of the backseat, sweating profusely, wearing disheveled clothing covered with vegetation. The police arrested the defendant.

While the defendant's vehicle was parked in the Citgo parking lot, Meehan searched it and found several pieces of a rock like substance on the dashboard and the scouring pad. Meehan conducted a field test of the rock like substance and testified that it tested positive for cocaine.[2]

---

[2] Rolfe was also arrested. By the time Rolfe testified at trial, she had pleaded guilty to illegal possession of narcotics and drug paraphernalia, and had completed her sentence of one year of probation. The state offered no consideration in exchange for Rolfe's testimony.

In a bill of particulars, the defendant was charged with possession of narcotics in violation of § 21a-279 (a), possession of drug paraphernalia in violation of General Statutes § 21a-267 (a) and interfering with an officer in violation of General Statutes § 53a-167a. At trial, the defendant denied that he had prepared the crack cocaine, brought it to the scene, seen drugs in the vehicle or used the scouring pad to make a pipe. The jury found the defendant guilty of possession of narcotics but not guilty of the other two charges.[3] The court sentenced the defendant to six years in prison. This appeal followed.

I

The defendant's first claim is that the court improperly failed to strike or otherwise cure the prejudicial effect of irrelevant, uncharged misconduct and bad character testimony concerning him. The defendant claims that the admission of the misconduct evidence constituted a violation of his right to a fair trial under both the state and federal constitutions.[4] We do not agree.

The defendant bases his claim on the following portions of the prosecutor's direct examination of two witnesses, Stringer and Jeffrey Kalolo, a sergeant in the New London police department. The prosecutor questioned Stringer as follows about his familiarity with the house to which the canine had tracked the defendant:

[3] The police never recovered the pipe that Meehan saw the defendant using, and there was conflicting evidence as to whether the defendant knew Meehan was a police officer.

[4] The defendant has failed to provide an analysis of the claimed constitutional violations under either the state or federal constitutions. We do not review constitutional claims that are inadequately briefed. See *State* v. *Cancel*, 275 Conn. 1, 3 n.2, 878 A.2d 1103 (2005). The defendant represented in his brief that the appropriate standard of review for this claim is the abuse of discretion standard. The abuse of discretion standard applies to evidentiary, not constitutional, claims. See id.

"[The Witness]: Once we got [onto Terrace Court], my canine partner continued to track down Terrace Court down toward Grove Street. He was favoring the right side of the street, Terrace Court, toward Grove . . . I believe it's 24 Grove Street. . . . He stopped at the front door of that house. . . .

"[Defense Counsel]: Just for the record, can we have—that house—the description for the record by counsel of what that house is?

"The Court: Would you describe . . .

"[The Prosecutor]: Are you familiar with this house?

"[The Witness]: I am familiar with that house—the house.

"[The Prosecutor]: What is this house?

"[The Witness]: The house is—the house on the corner of Terrace Court and Grove is—the last of my knowledge during that time it was the residence of . . . Timmy Bryant. And the last dealings I had there, I was the canine officer to assist narcotics and I believe statewide during a drug raid and seizure warrant.

"[Defense Counsel]: I'm going to ask that that be stricken. That's not *relevant* why he was at the residence.

"The Court: It's relevant insofar as he recognized and is able to describe the location, but don't pursue.

"[The Prosecutor]: The state would not pursue. I think [I] was asking in response to the issue raised by opposing counsel.

"The Court: What happened on that day had nothing to do with this defendant." (Emphasis added.)

The prosecutor thereafter queried Kalolo as follows about his familiarity with the defendant:

"[The Prosecutor]: Did you know who you were tracking when you started the track?

"[The Witness]: At the beginning of the track, no.

"[The Prosecutor]: When did it become known to you who you were tracking?

"[The Witness]: Somewhere as we're coming up the hill the information came out that we were possibly looking for [the defendant].

"[The Prosecutor]: But you were not sure that it was [the defendant]?

"[The Witness]: When we started the track?

"[The Prosecutor]: Right.

"[The Witness]: No.

"[The Prosecutor]: Once you observed the person in the backseat of this vehicle on the floor, did you know who it was?

"[The Witness]: Yes.

"[The Prosecutor]: And how did you know?

"[The Witness]: From past contacts with him. . . .

"[The Prosecutor]: And have you had reason to operate on this street in the past?

"[The Witness]: Yes.

"[The Prosecutor]: So, you're familiar with where this street was?

"[The Witness]: Yes.

"[The Prosecutor]: Was there anything that stood out in your mind when you were on this hill and it became known to you who you were possibly tracking?

"[The Witness]: Yes.

"[The Prosecutor]: What?

"[The Witness]: Prior to becoming a sergeant, I was assigned to the vice intelligence unit. We have had occasion to do an investigation into sales of drugs coming from the Bryant residence.

"[Defense Counsel]: Again, Your Honor, I've just got to ask how is this *relevant* to directly elicit whether or not there were sales of drugs at other residences; it's not relevant here. I'm concerned with why—

"[The Prosecutor]: The state was not intending to elicit that information, had no idea what the answer would be from the officer and would ask that it be stricken.

"The Court: I'll tell the jury. A prior incident that may or may not involve drugs isn't before us today, doesn't involve necessarily this particular defendant." (Emphasis added.)

"This court reviews evidentiary claims by an abuse of discretion standard." *State* v. *Lucas*, 63 Conn. App. 263, 273, 775 A.2d 338, cert. denied, 256 Conn. 930, 776 A.2d 1148 (2001). "Our standard of review of an evidentiary ruling is dependent on whether the claim is of constitutional magnitude. If the claim is of constitutional magnitude, the state has the burden of proving the constitutional error was harmless beyond a reasonable doubt. . . . Otherwise, in order to establish reversible error on an evidentiary impropriety, the defendant must prove both an abuse of discretion and a harm that resulted from such abuse." (Citations omitted; internal quotation marks omitted.) *State* v. *Swinton*, 268 Conn. 781, 797–98, 847 A.2d 921 (2004).

At trial, defense counsel objected to the two instances of claimed error on the basis of relevance. On appeal, the defendant claims that his right to a fair trial was

violated because the evidence concerned irrelevant, uncharged misconduct and bad character evidence.[5]

We agree with the state that the testimony to which the defendant objects on appeal did not implicate him directly and, therefore, did not constitute misconduct or bad character evidence concerning him. Stringer testified that he recognized the house where his canine partner tracked the victim's scent after defense counsel asked for a description of the house. Stringer also testified, when asked whether he was familiar with the house, that he had participated in the execution of a search and seizure warrant at the house, which was the residence of Timmy Bryant. There was no evidence that the defendant and Timmy Bryant are related or that the defendant was involved in the incident. When the defendant objected to the testimony on relevancy grounds, the court indicated that the testimony was

---

[5] "The rules governing the admissibility of evidence of a criminal defendant's prior misconduct are well established. Although evidence of prior unconnected crimes is inadmissible to demonstrate the defendant's bad character or to suggest that the defendant has a propensity for criminal behavior . . . such evidence may be admissible for other purposes, such as to prove knowledge, intent, motive, and common scheme or design, if the trial court determines, in the exercise of judicial discretion, that the probative value of the evidence outweighs its prejudicial tendency. . . . That evidence tends to prove the commission of other crimes by the accused does not render it inadmissible if it is otherwise relevant and material . . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only [when] injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Robles*, 103 Conn. App. 383, 398, 930 A.2d 27, cert. denied, 284 Conn. 928, 934 A.2d 244 (2007). "The standard by which the admissibility of evidence of uncharged misconduct is measured generally will depend on two factors; the purpose for which the evidence is offered, and the type of crime with which the defendant has been charged." *State* v. *Randolph*, 284 Conn. 328, 340–41, 933 A.2d 1158 (2007).

In this instance, although the defendant's identity was not contested, the state nonetheless was required to prove his identity to the jury. Moreover, the defendant asked that the state provide a foundation for the location of the house where the defendant was found hiding in a motor vehicle.

relevant to identify the location, and the prosecutor noted that the testimony was the result of defense counsel's request for such identification. The court promptly instructed the prosecutor not to pursue the warrant execution, and the state obeyed the court's instruction. The court also stated in the presence of the jury that "[w]hat happened on that day had nothing to do with this defendant."

Kalolo also was familiar with the street and house because he had been to the house as a member of a vice unit investigation and referred to the house as the Bryant residence. When defense counsel objected to the relevancy of Kalolo's testimony, the court instructed the jury that Kalolo's prior experience at the residence was not part of the trial and did not necessarily involve the defendant. Moreover, the defendant testified that he lived in Montville, not New London. Although the prosecutor asked that the testimony be stricken, the court did not do so specifically, but immediately instructed the jury that there was no evidence to associate the defendant with the prior events and that those events were not part of the defendant's trial. The jury is presumed to have followed the court's instructions unless there is evidence to the contrary in the record. See *State* v. *Flowers*, 278 Conn. 533, 547, 898 A.2d 789 (2006). We conclude, therefore, that the court did not improperly fail to strike the evidence or otherwise abuse its discretion.

## II

The defendant's second claim is that repeated prosecutorial impropriety deprived him of a fair trial.[6] Specifically, the defendant claims that the prosecutor

---

[6] The defendant has argued that if we do not conclude that the prosecutorial impropriety violated his right to due process, then his conviction should be reversed pursuant to our supervisory authority, citing *State* v. *Payne*, 260 Conn. 446, 451, 797 A.2d 1088 (2002). We decline the defendant's invitation to exercise our supervisory powers in this case.

improperly (1) asked police witnesses about their prior dealings with the defendant and (2) asked the defendant on cross-examination whether the state's witnesses were credible.

Our Supreme Court has stated: "In analyzing claims of prosecutorial impropriety, we engage in a two step process. . . . First, we must determine whether any impropriety in fact occurred; second, we must examine whether that impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial. . . . To determine whether the defendant was deprived of his due process right to a fair trial, we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Citations omitted; internal quotation marks omitted.) *State* v. *Bell*, 283 Conn. 748, 760, 931 A.2d 198 (2007).

## A

The defendant's first claim of prosecutorial impropriety concerns the prosecutor's examination of several of the police officers who participated in the defendant's capture and arrest or were present at the time. The defendant claims that the prosecutor improperly questioned three of the officers in such a way that they testified about the defendant's prior uncharged misconduct. We conclude that the prosecutor did not improperly examine Meehan, Stringer and Kalolo so as to admit evidence of the defendant's prior uncharged misconduct or bad character. Evidentiary matters "cannot be

claimed to establish a violation of fundamental constitutional rights." *State* v. *Henry*, 27 Conn. App. 520, 529, 608 A.2d 696 (1992).

As we concluded in part I, the state's examination of Stringer and Kalolo elicited evidence of events that took place at the house where the canine traced the defendant's scent. Despite the defendant's claim that that evidence, which the court instructed the jury to disregard, was evidence of prior uncharged misconduct or bad character, it did not concern the defendant. See part I. The testimony was an evidentiary matter, not a constitutional violation.

The defendant also claims that the prosecutor improperly examined Meehan as to his familiarity with the defendant. The following exchange took place:

"[The Prosecutor]: Now, a few moments back, I had inquired if you knew who was driving the car while you were in pursuit of this person. Did you have reason to ascertain or believe you knew who the alleged accused was?

"[The Witness]: Not during the initial pursuit. Once . . . somebody called in the plate number of the car they gave us, the plate came back, and the name didn't mean anything to me. And I remember radioing headquarters, [C]ould you call the registered owners of the vehicle [and] ask [them] who has the car, and that's when I was told by headquarters that the accused, [the defendant], had the car and, at the time, headquarters ran his name and said he was wanted on two misdemeanor failure to appear warrants out of the New London police department."

Thereafter, the prosecutor asked Meehan whether he had ever arrested the defendant. Defense counsel objected to the question, and the court sustained the objection. The prosecutor rephrased the question and

asked Meehan if he had dealings with the defendant in the past. The following exchange took place:

"[The Prosecutor]: Have you had dealings with the [defendant] in the past?

"[The Witness]: Yes, I have.

"[The Prosecutor]: . . . You had dealings with him. Were they recent?

"[The Witness]: No.

"[The Prosecutor]: Could you give an approximate time prior to this stop?

"[The Witness]: I think several times when I was a member of the state police department. I think I gave him some tickets for operating under suspension. I may have had personal contact with him once or twice in New London. Nothing sticks out that I can really . . . .

"[The Prosecutor]: There was no personal vendetta?

"[The Witness]: No.

"[The Prosecutor]: No bias?

"[The Witness]: No, sir.

"[The Prosecutor]: So, when you saw this vehicle, you were just doing your job. Would it be fair to say?

"[The Witness]: Yes, sir.

"[The Prosecutor]: And it wasn't until—you testified until you got that radio message that you knew who was driving?

"[The Witness]: Correct."

The prosecutor's line of questioning pertained to the identity of the defendant, which the state was required to prove, even if it was not disputed. Meehan's testimony concerning the defendant's traffic violations was given in response to the prosecutor's question about

how long ago Meehan had had dealings with the defendant. Meehan's answer was unresponsive to the question, but the defendant failed to bring that to the court's attention. The objective of the prosecutor's question, on the basis of his subsequent questions, was that Meehan had no current interaction with the defendant and was not out to get the defendant. We conclude, therefore, that there was no prosecutorial impropriety.

### B

The defendant claims that the second instance of prosecutorial misconduct occurred during the state's cross-examination of him. He claims that the prosecutor improperly asked him to comment on the veracity of other witnesses in violation of *State* v. *Singh*, 259 Conn. 693, 702–12, 793 A.2d 226 (2002). We disagree.

In *Singh*, our Supreme Court "adopted the well established evidentiary rule [in other jurisdictions] that it is improper to ask a witness to comment on another witness' veracity. . . . The primary reason for this prohibition . . . is that determinations of credibility are for the jury, and not for witnesses. . . . See *State* v. *Schleifer*, 102 Conn. 708, 724, 130 A. 184 (1925) ([i]t is never permissible, though often done, to ask a witness to characterize the testimony or statement of another witness); see also *Nimely* v. *New York*, 414 F.3d 381, 398 (2d Cir. 2005) ([t]he credibility of witnesses is exclusively for the determination by the jury, and *witnesses may not opine as to the credibility of the testimony of other witnesses* at the trial . . . ). Thus, questions that ask a defendant to comment on another witness' veracity [are improper because they] invade the province of the jury. . . . Moreover, [a]s a general rule, [such] questions have no probative value and are improper and argumentative because they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate

issue of guilt or innocence." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State v. Bell*, supra, 283 Conn. 778–79.

The defendant cites the following portion of the prosecutor's cross-examination to support his *Singh* violation claim:

"[The Prosecutor]: . . . And you're saying that all the witnesses that you heard testify, figment of their imagination, what they saw?

"[Defense Counsel]: He can't testify, and it's not appropriate for him to testify to anything other witnesses—he can testify to what he knows, he can't comment on other witnesses' testimony.

"[The Prosecutor]: The state claims it.

"The Court: Well, you could rephrase that question, but I think that he can comment on the other witnesses and what he heard because he disputes what they say. I think I'll overrule that objection.

"[Defense Counsel]: Again, I guess asking him to say whether or not what they claim was a figment of their imagination; he can ask . . .

"The Court: That's why I asked him to rephrase. I'll overrule your objection.

"[The Prosecutor]: Do you agree with the testimony of the prior witnesses?

"[The Defendant]: No.

"[The Prosecutor]: Do you agree that you were there?

"[The Defendant]: Of course.

"[The Prosecutor]: You do agree you were in the car?

"[The Defendant]: Of course.

"[The Prosecutor]: You do agree that the young female sat in your car?

"[The Defendant]: Yes, I do.

"[The Prosecutor]: You do agree that you left that car? . . .

"[The Defendant]: Of course.

"[The Prosecutor]: How did you exit that car?

"[The Defendant]: I jumped across [the woman] and ran. . . .

"[The Prosecutor]: Now, on the date and time you left the car, is your testimony here today that you saw an officer with a gun?

"[The Defendant]: I seen a person with a gun.

"[The Prosecutor]: You saw a person with a gun?

"[The Defendant]: Yes.

\* \* \*

"[The Prosecutor]: So, you would not agree with the testimony that was given by the dog handler, who said [that] when the dog led him to that car, the response from your mouth was, I give up?

"[The Defendant]: That's not true. That was untrue. That was untrue.

"[The Prosecutor]: More than one officer said that he heard you say that [and that] you had your hands up. You say that it's untrue?

"[The Defendant]: It's definitely untrue.

\* \* \*

"[The Prosecutor]: So, you're in agreement with everything, all the testimony here today but not as to the fact that they identified themselves as police officers?

"[The Defendant]: I'm not in agreement to what they testified to. To what I testified to, that's what I'm in agreement."

We agree with the court that the question concerning the officers' imaginations needed to be rephrased. The subsequent questions that the prosecutor asked did not seek to have the defendant characterize the testimony, or credibility, of other witnesses, but rather were designed to ferret out the facts of the case. The defendant testified that he disagreed with prior testimony. The prosecutor's follow-up questions sought to elicit the facts with which the defendant did not agree. The same information could have been elicited by questions such as, "Were you there?" and, "Were you with a female?" The substance of the answers provided by the defendant were facts about which he had firsthand knowledge. The questions about whether the defendant agreed with certain facts, therefore, were not questions asking him to characterize the testimony of other witnesses and, thus, were not improper. See *State* v. *Santiago*, 269 Conn. 726, 743, 850 A.2d 199 (2004). The questions at issue are distinguishable from the improper questions asked in *State* v. *Bell*, supra, 283 Conn. 779, in which the prosecutor asked the defendant whether a witness was "wrong," which is a characterization of testimony.

On the basis of our review of the questions posed by the prosecutor that the defendant claims were improper, we find that only one of them required the defendant to respond with a characterization of the testimony of others, i.e., "More than one officer said that he heard you say that [and that] you had your hands up. You say that it's untrue?" That question, however, was in response to the defendant's own, unprompted characterization of the officer's testimony as "not true." Under circumstances in which a witness sua sponte opens the door, the prosecutor is free to

pursue that line of questioning. See *State* v. *Sells*, 82 Conn. App. 332, 338, 844 A.2d 235, cert. denied, 270 Conn. 911, 853 A.2d 529 (2004). For the foregoing reasons, we conclude that there was no prosecutorial impropriety or a denial of the defendant's constitutional rights.

The judgment is affirmed.

In this opinion the other judges concurred.