STATE OF CONNECTICUT *v.* JOHN R. PELOSO III
(AC 27766)

DiPentima, McLachlan and Gruendel, Js.

---

Argued February 20—officially released August 5, 2008

Hope C. Seeley, with whom were Benjamin B. Adams and, on the brief, Hubert J. Santos, for the appellant (defendant).

Margaret Gaffney Radionovas, senior assistant state's attorney, with whom, on the brief, were James E. Thomas, former state's attorney, and David L. Zagaja, senior assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, J. The defendant, John R. Peloso III, appeals from the judgment of conviction, rendered after a trial to the court, of assault in the second degree in violation of General Statutes § 53a-60 (a) (4),[1] delivery of a controlled substance in violation of General Statutes § 21a-277 (b)[2] and sexual assault in the third degree

---

[1] General Statutes § 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when . . . (4) for a purpose other than lawful medical or therapeutic treatment, he intentionally causes stupor, unconsciousness or other physical impairment or injury to another person by administering to such person, without his consent, a drug, substance or preparation capable of producing the same . . . ."

[2] General Statutes § 21a-277 (b) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with intent to sell or dispense, possesses with intent to sell or dispense, offers, gives or administers to another person any controlled substance, except a narcotic substance, or a hallucinogenic substance other than marijuana, except as authorized in this chapter, may, for the first offense, be fined not more than

in violation of General Statutes § 53a-72a (a) (1) (A).[3] On appeal, the defendant claims that the trial court (1) committed structural error by assuming the role of advocate on behalf of the state, (2) failed to maintain an appearance of impartiality during defense counsel's cross-examination of a witness, (3) improperly admitted certain evidence of prior misconduct and (4) violated his constitutional protection against double jeopardy by convicting and sentencing him multiple times for the same offense. We affirm the judgment of the trial court.

The court reasonably could have found the following facts. On August 27, 2004, at approximately 6 or 7 p.m., the victim[4] met the defendant, with whom she had worked for more than six years and whom she regarded as a friend, for food and drinks at the Wood N' Tap restaurant in Hartford. After the victim and the defendant each had consumed a couple of alcoholic beverages and some food, they left the Wood N' Tap and drove to Tisane, a martini bar in West Hartford, where they each had another alcoholic drink and more food. Shortly after 10 p.m., the defendant and the victim left Tisane and drove in separate cars to Glastonbury, where they attended a party hosted by friends of the defendant. At the party, the victim consumed three or four more alcoholic beverages. Toward the end of their stay at the party, the defendant offered the victim a pill, which

twenty-five thousand dollars or be imprisoned not more than seven years or be both fined and imprisoned; and, for each subsequent offense, may be fined not more than one hundred thousand dollars or be imprisoned not more than fifteen years, or be both fined and imprisoned."

[3] General Statutes § 53a-72a (a) provides in relevant part: "A person is guilty of sexual assault in the third degree when such person (1) compels another person to submit to sexual contact (A) by the use of force against such other person or a third person . . . ."

[4] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

he stated would help her hangover for later that morning. The victim, who was scheduled to work later that morning, followed the defendant's advice and took the pill. At approximately 2 a.m., the defendant and the victim left the party together and drove in separate cars to the defendant's apartment in Glastonbury.

After arriving at the defendant's apartment, the victim and the defendant each consumed another alcoholic beverage. The victim then selected a movie, "Silence of the Lambs," from the defendant's DVD collection and lay on a sofa. She fell asleep shortly after the movie began.

At approximately 4 a.m., the defendant picked up the victim from the couch and started to carry her upstairs to the second floor of his apartment. As they reached the top of the stairs, the defendant set the victim down, and she woke up. The victim soon realized that she was not wearing any pants and quickly ran back down the stairs to find her missing clothes. She found her pants lying folded behind the sofa where she had been sleeping.[5]

After putting her clothes back on, the victim noticed a camera nearby. She began to recall the flashing of lights and the sound of a camera taking photographs while she had been lying on the sofa. Convinced that the defendant had taken photographs of her without her pants on, the victim demanded that the defendant give her the film inside the camera. After a brief discussion, the defendant opened the camera, exposing the film inside, and gave the victim the film from the camera and the film's casing. She left the apartment and called the police from her car.

---

[5] The victim testified that she had consumed large amounts of alcohol and passed out at the defendant's apartment on five to seven previous occasions. On at least two of those occasions, she woke up in the defendant's bed with some or all of her clothing missing.

Several Glastonbury police officers arrived a short time later. The officers detected a strong odor of alcohol on the victim's breath as she recounted her story, but she did not show any other signs of alcohol intoxication, such as difficulty moving or speaking. The victim gave the officers the film and casing that she had taken from the defendant.[6]

The victim was transported to Saint Francis Hospital and Medical Center. At the hospital, she submitted to an examination for signs of sexual assault and, at 9:15 a.m., gave blood and urine samples. The physical examination revealed no signs of an assault. During the examination, however, she recounted certain events, which she recalled in greater detail at trial. After falling asleep on the defendant's sofa, she felt as though she was drifting in and out of consciousness and, when she was conscious, felt "completely different," as though things that happened to her were "happening to someone else."[7] She remembered that the defendant had removed some of her clothing and had taken photographs of her. She also remembered watching the defendant kissing her, fondling her breasts and penetrating her vagina with his fingers. The victim stated that it "felt good" in a "sick way" when the defendant was touching her with his hands, but not when he had kissed her.

Sometime before arriving at the hospital, the victim had taken two additional unidentified pills. The victim's urine sample revealed an alcohol level of 0.13 and the

---

[6] Pursuant to a search warrant, the police retrieved additional film from the defendant's apartment. None of the five rolls of film collected by the police depicted any photographs of nude women. On the morning of the incident, Officer Jeffrey Hodder and another officer interviewed the defendant, who invited them into his apartment and showed them a scene from "Silence of the Lambs," in which a flash camera was used to take several photographs.

[7] The victim testified that this experience was different from other occasions when she had consumed large amounts of alcohol. On those occasions, she would typically pass out completely, rather than drift in and out of sleep.

presence of methylene dioxy amphetamine (MDA), a controlled substance.[8] Her blood sample revealed an alcohol level of 0.07 by weight and the presence of acetaminophen. No MDA was detected in the victim's blood sample. A subsequent search of the defendant's apartment, pursuant to a warrant, produced pill bottles containing residual amounts of MDA, methylene dioxy methamphetamine (MDMA) and other controlled substances.[9]

By a long form information dated March 22, 2006, the state charged the defendant, in seven counts, with (1) kidnapping in the first degree, (2) assault in the second degree, (3) delivery of a controlled substance, (4) two counts of sexual assault in the first degree, (5) sexual assault in the second degree and (6) sexual assault in the third degree. The defendant elected a trial to the court on all seven charges. Following the state's case-in-chief, the court granted the defendant's motion for a judgment of acquittal as to the first count, kidnapping in the first degree. After the state's rebuttal case, the court found the defendant guilty on the charges of assault in the second degree, delivery of a controlled substance and sexual assault in the third degree— counts two, three and seven, respectively. The court found the defendant not guilty of the remaining charges, counts four through six. One June 8, 2006, the court sentenced the defendant to a total effective term of twelve years imprisonment, execution suspended after

[8] Methylene dioxy amphetamine is an analog of methylene dioxy methamphetamine, collectively known as "ecstasy." These drugs are central nervous system stimulants that produce heightened sensitivity to sensory stimulation, hallucinations and altered perceptual sense, in addition to increased energy, euphoria and empathy.

[9] Among the controlled substances found were tramadol and oxycodone, which are pain relievers, cocaine, MDE, which is another analog of MDMA and causes similar effects, and ketamine, which is a pain killer used primarily for animals but also known to be used to facilitate "date rape" by causing mental and physical impairment and memory loss.

eight years, followed by ten years probation. The defendant filed this appeal.

I

The defendant's first claim on appeal is that the court improperly interposed itself into the trial as an advocate on behalf of the state, thereby depriving him of his constitutional right to due process and a fair trial by an impartial finder of fact.[10] Specifically, the defendant claims that after the defense had rested and the state had indicated it would not offer rebuttal testimony, the court committed structural error by improperly suggesting to the state who to call as a rebuttal witness and what information to solicit from that witness. In support of his claim, the defendant argues that the additional testimony assisted the state in meeting its burden of proving a material fact, namely, that he had delivered a controlled substance to the victim. In response, the state argues that the court, sitting as the finder of fact, properly made the suggestion to the state and that even if the suggestion was improper, any error was harmless. We agree with the state that the court's intervention was harmless.

The following facts are necessary to our resolution of the defendant's first claim. During its case-in-chief, the state called Mark Anderson, a chemist with the toxicology and controlled substances laboratory for the

---

[10] The defendant does not provide an analysis of his claim under the constitution of Connecticut independent of his claim under the analogous provisions of the United States constitution. "[W]e will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim . . . ." (Internal quotation marks omitted.) *State* v. *Fauntleroy*, 101 Conn. App. 144, 159 n.5, 921 A.2d 622 (2007). Accordingly, we confine our analysis to the defendant's federal constitutional claim. See *State* v. *Eady*, 249 Conn. 431, 435 n.6, 733 A.2d 112, cert. denied, 528 U.S. 1030, 120 S. Ct. 551, 145 L. Ed. 2d 428 (1999).

department of public safety (laboratory). Anderson testified that when the laboratory receives a blood or urine sample to be analyzed for the presence of a particular substance, he conducts two tests. The first is a presumptive test to determine whether that substance might be present in the sample. The presumptive test is followed by a second confirmatory test to identify positively the substance. Both the presumptive test and the confirmatory test revealed that the sample of the victim's urine taken at 9:15 a.m. on August 28, 2004, contained MDA, but no MDA was detectable in the sample of her blood taken at the same time. Neither the state nor the defendant elicited testimony from Anderson as to the sensitivity of equipment he used to detect the substances in the victim's blood and urine samples.

The state next called Robert Powers, the director of the laboratory. Powers testified as to the general effects, including the lethal effects, of MDA abuse. Powers also testified that the limit of detection[11] of MDA in a urine sample, using the laboratory's equipment, is 100 nanograms per milliliter. Neither the state nor the defendant, however, elicited testimony from Powers as to the limit of detection of MDA in a sample of blood using the laboratory's equipment. Moreover, Powers could not opine, within a reasonable degree of scientific certainty, at what time the victim had ingested the MDA so that her urine sample would contain detectable levels of MDA but her blood sample would not.

Finally, the state called James O'Brien, who testified, as an expert in the field of pharmacology,[12] as to the general effects of MDA. O'Brien opined, on the basis of the victim's description of her symptoms, that the victim was under the influence of MDA during the early

---

[11] The limit of detection refers to the minimum amount of a drug that must be present in a sample in order for that drug to be detected in the sample.

[12] Pharmacology is the study of the effects of drugs and chemicals on animals and humans.

morning hours of August 28, 2004. He could not give an opinion as to the time that the victim had ingested the MDA that was detected in her urine sample. He did opine, however, that absent an unusually high dose, she probably did not ingest the MDA more than one day prior to exhibiting its effects.

After the state had rested, the defendant called a number of witnesses to rebut the state's evidence. Through his witnesses, the defendant attempted to demonstrate that the victim must have consumed the MDA that was in her urine prior to the time she was with the defendant on the evening of August 27, 2004, because otherwise, her blood sample would have yielded a detectable level of MDA as well.

To challenge the testimony by the state's experts, the defendant called Francis Gengo, a clinical pharmacologist with an extensive research background in pharmacokinetics.[13] According to Gengo, the typical recreational dose of MDA, 100 milligrams, would have produced concentrations in the victim's blood sample between sixty and eighty nanograms of MDA per milliliter of blood. Gengo opined that the victim had not ingested a dose of MDA sufficient to be under the influence of that drug during the early morning hours of August 28, 2004, because such a dose would have yielded a measurable concentration of MDA in her blood sample.[14] Gengo formed his opinion on the basis of the fact that Powers had told him that the limit

[13] Pharmacokinetics is the quantitative study of how the human body absorbs, distributes and eliminates drugs.

[14] Gengo also explained that when MDMA is ingested, it is metabolized partially by the liver into a variety of substances, including MDA. Both MDMA and MDA then are distributed through the blood to the brain, where they produce their clinical effects. Gengo opined that the victim had not ingested a dose of MDMA sufficient to be under the influence of either MDMA or MDA during the early morning hours of August 28, 2004, because although MDA may not have been detected, such a dose would have yielded a measurable concentration of MDMA in her blood sample.

of detection of MDA in a sample of blood, using the laboratory's tests, is between twenty and fifty nanograms of MDA per milliliter of blood.

After Gengo testified, the defense rested. The court, in seeking to resolve an issue it had with Gengo's testimony, initiated the following colloquy:

"The Court: Further from the defense?

"[Defense Counsel]: Nothing further, Your Honor. We rest. . . .

"The Court: All right. Will there be rebuttal?

"[The Prosecutor]: No, sir.

"The Court: No one is going to tell me what Dr. Powers says is—[the limit of detection] is?

"[The Prosecutor]: Well, I attempted to several times. I don't know if reoffering it is going to qualify.

"The Court: You never asked him about blood. I let in the urine.

"[The Prosecutor]: If I could tomorrow morning, the, Your Honor. . . .

"The Court: "I'll make myself available. I'd be interested in Dr. Powers' testimony. My notes and my memory—am I incorrect that no one ever asked about the [limit of detection] of blood? . . . I'd be interested, if it's available. If not, not. . . . What I am interested in is what the [limit of detection] of the equipment they have over there is, if anybody wants to offer it."

The next day, April 5, 2006, the defendant filed a motion for a mistrial, claiming that the court's suggestion to the state to offer rebuttal testimony violated the court's duty to adjudicate the case impartially and assisted the state in prosecuting the defendant, thereby resulting in irreparable prejudice to his case in violation

of the fifth, sixth and fourteenth amendments to the United States constitution and article first, §§ 8, 9 and 20, of the Connecticut constitution. The court denied the defendant's motion. In doing so, the court stated: "I have no clue as to what Dr. Powers is about to say, and it may help your case, and it may help the state's. I have two hearsay—two basically unreliable or—not unreliable, but problematic statements about the limit of detection of MDA in blood, and I'm interested in the truth. . . . I'm interested in resolving a piece of evidence that is unclear to me."

The state then called Powers back to the witness stand. Powers testified that he did not know the limit of detection of MDA in blood using the laboratory's equipment. Powers testified, however, that he had, in fact, told Gengo that the limit of detection using the laboratory's test equipment was probably between twenty and fifty nanograms of MDA per milliliter of blood. The court admitted this testimony only as to the credibility of Gengo's testimony.

The defendant urges us to conclude that the court improperly intervened in the merits of the case, thus placing it in the role of advocate, by soliciting testimony that was essential to overcome the defendant's presumption of innocence. He asserts that the court's improper conduct rendered the trial fundamentally unfair and requires automatic reversal on the basis of structural error. We agree that the information requested by the court, had it been adduced, could have borne "the seeds of tilting the balance" in this case. (Internal quotation marks omitted.) *State* v. *Fernandez*, 198 Conn. 1, 12, 501 A.2d 1195 (1985). Because the evidence that the court had requested never was provided, however, we conclude that the court's intervention did not constitute structural error and was harmless beyond a reasonable doubt.[15]

---

[15] "[T]he [United States] Supreme Court has noted that there is a very limited class of cases involving error that is structural, that is to say, error

Well established principles regarding the responsibilities of the court in conducting a criminal trial guide our resolution of the defendant's claim. "Due process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced [fact finder] in an atmosphere of judicial calm. . . . In a criminal trial, the judge is more than a mere moderator of the proceedings. It is [the court's] responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding." (Internal quotation marks omitted.) *State* v. *Iban C.*, 275 Conn. 624, 651, 881 A.2d 1005 (2005). In pursuit of this goal, "[t]he trial judge has the responsibility for safeguarding both the rights of the accused and the interests of the public in the administration of criminal justice." (Internal quotation marks omitted.) *State* v. *Fernandez*, supra, 198 Conn. 11.

This does not mean, however, that the trial court is merely a referee on the sidelines of the proceedings, there to ensure that the contestants observe the rules. As a matter of tradition, it is constitutionally acceptable under our system of jurisprudence for the trial judge, from time to time, to intervene in the conduct of a case. Id.

The discussion of United States Court of Appeals for the Second Circuit in *United States* v. *Filani*, 74 F.3d

that transcends the criminal process. . . . Structural [error] cases defy analysis by harmless error standards because the entire conduct of the trial, from beginning to end, is obviously affected . . . . These cases contain a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. . . . Such errors infect the entire trial process . . . and necessarily render a trial fundamentally unfair . . . . Put another way, these errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair." (Citations omitted; internal quotation marks omitted.) *State* v. *Lopez*, 271 Conn. 724, 733–34, 859 A.2d 898 (2004).

378, 383–84 (2d Cir. 1996), is instructive: "The trial judge's role in our jurisprudence came to us from the common law of England. . . . [T]he English trial judge is not a passive instrument of the parties, but has an independent duty to investigate the truth and, in so doing, may put questions in whatever form he pleases to the witness to elicit the truth more fully. . . . As a consequence, English judges traditionally exercised much control over juries in matters of fact as well as law. . . . This common law practice was one that, under the [c]onstitution, descended to and has been more or less maintained by [our] courts. . . . Thus, American judges, at least in theory, have some of the same powers in the conduct of a trial as their English counterparts. . . . [However, some] experienced trial judges have championed the view that our adversarial system gives little room for trial judges' questioning of witnesses. . . . One of the reasons for allowing an English judge greater latitude to interrogate witnesses is that a British trial, so it is said, is a search for the truth. In our jurisprudence a search for the truth is only one of the trial's goals; other important values—individual freedom being a good example—are served by an attorney insisting on preserving the accused's right to remain silent or by objecting to incriminating evidence seized in violation of an accused's [f]ourth [a]mendment rights. The successful assertion of these rights does not aid—and may actually impede—the search for truth." (Citations omitted.) Id.

The issue in the present case is whether the court's exercise of its common-law power to ascertain the truth exceeded the limits of that power as established by the due process clause of the United States constitution. "Under the Anglo-American adversary trial system, the parties and their counsel have the primary responsibility for finding, selecting, and presenting the evidence.

However, our system of party-investigation and party-presentation has some limitations. It is a means to the end of disclosing truth and administering justice; and for reaching this end the judge may exercise various powers." *United States* v. *Karnes*, 531 F.2d 214, 216 n.1 (4th Cir. 1976); see also Practice Book § 42-39 (judicial authority, sua sponte, may appoint expert witness). Among those powers, "[i]t is permissible, though it is seldom very desirable, for a judge to call and examine a witness whom the parties do not wish to call." *United States* v. *Marzano*, 149 F.2d 923, 925 (2d Cir. 1945); see also *United States* v. *Karnes*, supra, 216.

"Thus, when it clearly appears to the judge that for one reason or another the case is not being presented intelligibly to the [finder of fact], the judge is not required to remain silent. On the contrary, the judge may, by questions to a witness, elicit relevant and important facts." (Internal quotation marks omitted.) *State* v. *Tatum*, 219 Conn. 721, 740, 595 A.2d 322 (1991). Such interventions may be necessary, for example, to resolve doubts as to the admissibility of certain evidence, to restrain a garrulous witness or to clarify questions that the witness may not understand. *State* v. *Fernandez*, supra, 198 Conn. 13. "Whe[n] the testimony is confusing or not altogether clear the alleged jeopardy to one side caused by the clarification of a [witness'] statement is certainly outweighed by the desirability of factual understanding." (Internal quotation marks omitted.) *State* v. *Iban C.*, supra, 275 Conn. 652. "A trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree before the risk of either impaired functioning of the [finder of fact] or lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits." (Internal quotation marks omitted.) *Daye* v. *Attorney General of New York*, 712 F.2d 1566, 1572 (2d Cir. 1983), cert.

denied, 464 U.S. 1048, 104 S. Ct. 723, 79 L. Ed. 2d 184 (1984).

"It is, however, important . . . that the [j]udge be aware that there may be greater risk of prejudice from overintervention than from underintervention. While the judge should not hesitate to exercise his or her authority when necessary, the judge should avoid trying the case for the lawyers." (Internal quotation marks omitted.) *State* v. *Fernandez,* supra, 198 Conn. 11. "[I]t should be kept in mind that the [i]nterrogation of witnesses tends to assimilate the court's role with the advocate's, and may tread over the line separating the provinces of judge and jury. . . . There is the risk that the questioning [of witnesses] may bear the seeds of tilting the balance against the accused and place the judge . . . on the side of the prosecution." (Internal quotation marks omitted.) Id., 12; *United States* v. *Barbour,* 420 F.2d 1319, 1321 (D.C. Cir. 1969). "Prosecution and judgment are two quite separate functions in the administration of justice; they must not merge." (Internal quotation marks omitted.) *State* v. *Fernandez,* supra, 17, quoting *United States* v. *Marzano,* supra, 149 F.2d 926.

"The risk of constitutional judicial misconduct is greatest in cases where the trial court has interceded in the *merits* of the trial." (Emphasis added; internal quotation marks omitted.) *State* v. *Lopes,* 78 Conn. App. 264, 277, 826 A.2d 1238, cert. denied, 266 Conn. 902, 832 A.2d 66 (2003). In other words, the court may not solicit evidence that is "*essential* to overcome the defendant's presumption of innocence . . . ." (Emphasis in original.) *United States* v. *Karnes,* supra, 531 F.2d 217. For example, it is improper for the court, through commentary or questioning of a witness, to discredit a witness' testimony in front of a jury when the credibility of that witness is a significant issue. See *State* v. *Fernandez,* supra, 198 Conn. 11–12; *United States* v. *Filani,*

supra, 74 F.3d 385; cf. *State* v. *Tatum*, supra, 219 Conn. 740–41. As our Supreme Court noted in *State* v. *Fernandez*, supra, 12, the jury has a natural tendency to look to the trial judge for guidance. Thus, the court must take great caution not to intervene in such a manner that it implies to the jury the result the court supposedly desires. See id. In the case before us, however, the judge and fact finder were one and the same. Accordingly, any appearance of partiality in the court's conduct carried less danger of prejudicing the defendant than it would have in a jury trial.[16] See *Jackson* v. *United States*, 329 F.2d 893, 894 (D.C. Cir. 1964) ("[i]n a nonjury case, as in an appellate court, needless or active interrogation by judges, although not always helpful, is rarely prejudicial").

"Any claim that the trial judge crossed the line between impartiality and advocacy is subject to harmless error analysis." (Internal quotation marks omitted.) *State* v. *Lopes*, supra, 78 Conn. App. 275. The inquiry for identifying harmless constitutional error is whether the error was harmless beyond a reasonable doubt. *State* v. *Fernando R.*, 103 Conn. App. 808, 822, 930 A.2d 78, cert. denied, 284 Conn. 936, 937 A.2d 695 (2007).

At the outset, we note that the defendant does not appear to claim that the court abused its discretion in allowing Powers to be recalled as a witness after both parties had rested, and we do not conclude otherwise. See *State* v. *Montini*, 52 Conn. App. 682, 687, 730 A.2d 76 (decision to open criminal case to add further testimony lies within sound discretion of trial court), cert. denied, 249 Conn. 909, 733 A.2d 227 (1999); see also *State* v. *Iban C.*, supra, 275 Conn. 652 (whether trial judge shall question witness is within his sound discretion); *United*

---

[16] We note that nearly all of the cases cited by the defendant in support of his claim of error are immediately distinguishable from the present case in that they involved either jury trials or noncriminal proceedings in which there was no presumption of innocence to overcome.

*States* v. *Karnes*, supra, 531 F.2d 216 (court has authority, if not duty, to call witnesses who possess relevant information affecting outcome of issues when parties decline to call them so long as it is done impartially). The thrust of the defendant's claim is that the court exceeded its authority in inviting the state to elicit specific testimony from Powers, not to clarify previous testimony or to resolve a doubt as to the admissibility of certain evidence, but to set forth additional substantive evidence of the defendant's guilt. Thus, he argues, even if the court's proposed inquiry was framed in a neutral manner,[17] the substantive nature of the inquiry crossed the line between impartiality and advocacy in violation of the defendant's right to due process. We agree.

Prior to the court's intervention, the defendant had elicited testimony from Gengo in an attempt to show that the victim had ingested the MDA sometime before joining the defendant's company. In support of this defense, Gengo opined that if the victim had ingested the MDA during the period that the defendant was with her, she would have ingested a dose of MDA sufficient to yield a *measurable* concentration in her blood sample, i.e., between sixty and eighty nanograms of MDA per milliliter of blood. Gengo testified that his opinion was based on Powers' statement to him that the limit of detection of MDA in a sample of blood was between twenty and fifty nanograms of MDA per liter of blood. No substantive evidence had been offered, through Gengo or any prior witness, as to the actual sensitivity

---

[17] We disagree with the defendant's assertion that the court had aligned itself with the state in requesting additional testimony from Powers. The court invited *both* parties to call a witness who could testify as to the limit of detection of MDA in blood. Although the state accepted the court's invitation, we cannot conclude, on the basis of the record in this case, that the court was attempting to assist the state in meeting its burden of proof. As the court properly noted, it had "no clue as to what . . . Powers [was] about to say, and it may help [the defendant's] case, and it may help the state's."

of the laboratory's testing equipment.[18] Accordingly, Gengo's expert opinion was nothing more than hypothesis and speculation because an important fact on which his opinion rested, the limit of detection of MDA in blood, had not been established by the evidence. See *DiNuzzo* v. *Dan Perkins Chevrolet Geo, Inc.*, 99 Conn. App. 336, 344–46, 913 A.2d 483 (expert opinion cannot be credited if based on subordinate facts not supported by evidence), cert. granted on other grounds, 281 Conn. 929, 918 A.2d 277 (2007); *State* v. *Blades*, 225 Conn. 609, 629, 626 A.2d 273 (1993) (court should reject entirety of expert testimony if based on subordinate facts that were not proven); *Nash* v. *Hunt*, 166 Conn. 418, 426, 352 A.2d 773 (1974) (same).

The additional evidence requested by the court, had it come before the court, could have had a significant impact on the outcome of this case. Had Powers been able to testify, for example, that the laboratory's equipment could detect a mere twenty nanograms of MDA in a milliliter of blood, that testimony would have gone a long way toward establishing the reliability of Gengo's opinion and earning the defendant an acquittal. More importantly, on the other hand, testimony by Powers that the laboratory's tests could detect no fewer than 100 nanograms of MDA in a milliliter of blood, would have been devastating to both Gengo's opinion and the defendant's defense.

We conclude, however, that the court's intervention in this case was harmless. First, we reject the defendant's claim that the court's intervention was essential to overcome the defendant's presumption of innocence because by the time the court had intervened, it already had sufficient evidence from which it properly could

---

[18] See *State* v. *Henry*, 27 Conn. App. 520, 529–30, 608 A.2d 696 (1992); Conn. Code Evid. § 7-4 (b); C. Tait, Connecticut Evidence (3d. Ed. 2001) § 7.9.3, p. 534.

convict the defendant. Cf. *United States* v. *Karnes*, supra, 531 F.2d 216–17 (government's case insufficient as matter of law without witnesses court called to testify). During the state's case-in-chief, the court heard testimony from the victim, who the court found to be credible, that the defendant had given her a single pill, that a short time later she experienced symptoms consistent with the recent ingestion of MDA and that while she was experiencing those symptoms, the defendant had compelled her to submit to sexual contact. The court also received evidence that the defendant had possessed MDA in pill containers in his apartment. The court took further evidence that a urine sample taken from the victim contained a detectable amount of MDA. Finally, the court heard testimony from the defendant's expert that the victim's clinical symptoms were consistent with the consumption of MDA.

Moreover, the actual level of sensitivity of the laboratory's equipment never was adduced. Powers testified that he did not know the limit of detection of MDA in blood using the laboratory's equipment. His testimony failed to provide the court with the evidentiary basis that it needed in order to find the facts on which Gengo had based his opinion.[19] Accordingly, the court could not rely on Gengo's opinion as to whether the victim had ingested a dose of MDA sufficient to yield a measurable concentration of MDA in her blood sample. See *DiNuzzo* v. *Dan Perkins Chevrolet Geo, Inc.*, supra, 99 Conn. App. 344–46. The additional testimony contributed nothing to the reliability of Gengo's opinion or to the court's use of that opinion in its deliberation. See *United States* v. *Carengella*, 198 F.2d 3, 8 (7th Cir.) (court's instruction to prosecutor to "go back and pick

[19] Contrary to the defendant's statement in his brief, Powers' testimony regarding the limit of detection of MDA in blood was not admitted for its truth and, therefore, was not "crucial in the [c]ourt's determination that the [d]efendant was guilty . . . ."

up . . . about [witness'] previous conversation with" defendant harmless), cert. denied, 344 U.S. 881, 73 S. Ct. 179, 97 L. Ed. 682 (1952). The additional testimony, therefore, was harmless beyond a reasonable doubt.

## II

The defendant next claims that the court improperly denied his motion for a mistrial after it had committed structural error by failing to maintain an appearance of impartiality during the cross-examination of a witness. Specifically, he claims that the court's conduct during the cross-examination gave comfort and support to the witness to the extent that it demonstrated bias in favor of the witness and animosity toward the defendant. In support of his claim, the defendant argues that the court's conduct was improper in the following ways: the court severely chastised defense counsel for asking the witness a question after an objection to that question had been sustained; the court interrupted the cross-examination to offer the witness a glass of water; and the court expressed in front of the witness skepticism about a particular line of defense counsel's questions.[20] We reject each of the defendant's arguments in turn and conclude that the court properly denied the defendant's motion for a mistrial.

"The standard for review of an action upon a motion for a mistrial is well established. While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a

---

[20] The defendant also argues that the court demonstrated an appearance of partiality by interrupting the cross-examination to rebuke defense counsel for making an inappropriate facial expression. We note that the record is inadequate to review this claim because we are unable to identify from the record whether defense counsel, in fact, had made such a facial expression. *See United States* v. *Filani*, supra, 74 F.3d 385. Accordingly, we decline to review this part of the defendant's claim. See Practice Book § 61-10; *Lucas* v. *Lucas*, 88 Conn. App. 246, 251–52, 869 A.2d 239 (2005).

character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome. . . . In [our] review of the denial of a motion for mistrial, [we recognize] the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors. . . . Therefore, [i]n those cases in which an abuse of discretion is manifest or where injustice appears to have been done, reversal is required." (Citations omitted; internal quotation marks omitted.) *State* v. *Hamlett*, 105 Conn. App. 862, 872–73, 939 A.2d 1256, cert. denied, 287 Conn. 901, 947 A.2d 343 (2008).

The defendant first argues that the court's rebuke of defense counsel during his cross-examination of a witness "represents the very antithesis of the 'judicial calm' " required by the fifth amendment to the United States constitution. See *State* v. *Iban C.*, supra, 275 Conn. 651. In support of his argument, he characterizes the court's response as an "explosive verbal tirade," an "outburst," an "attack" and "rage," and suggests that the court was "out of control" and "explode[d] in anger." We disagree with the defendant's descriptions of the court's conduct and, accordingly, reject the defendant's argument that the court's action deprived him of a fair trial.

We begin our analysis of the defendant's argument by noting that defense counsel's conduct invited the court's reprimand.[21] "The Superior Court has inherent and statutory authority to regulate the conduct of attorneys who are officers of the court." (Internal quotation marks omitted.) *State* v. *Drakeford,* 63 Conn. App. 419, 424–25, 777 A.2d 202 (2001), aff'd, 261 Conn. 420, 802 A.2d 844 (2002). In its execution of this duty, the court has broad discretionary power, and we will accord every reasonable presumption in favor of its actions. See *State* v. *Jones,* 180 Conn. 443, 448, 429 A.2d 939 (1980), overruled in part on other grounds by *State* v. *Powell,* 186 Conn. 547, 555, 442 A.2d 939, cert. denied sub nom. *Moeller* v. *Connecticut,* 459 U.S. 838, 103 S. Ct. 85, 74 L. Ed. 2d 80 (1982). "Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) Id.

---

[21] The statements by the court to which the defendant objects were part of the following colloquy:

"[Defense Counsel]: You have a temperament problem?

"[The Prosecutor]: Objection.

"[The Witness]: No.

"The Court: Sustained.

"[The Witness]: No.

"[Defense Counsel]: You don't have a temperament problem?

"[The Witness]: No.

"[The Prosecutor]: Objection.

"The Court: I have sustained the objection, [defense counsel]. What are you thinking of asking that question again?

"[Defense Counsel]: I apologize, Your Honor. I didn't—I don't—

"The Court: I think you should apologize. Do not do that again.

"[Defense Counsel]: I apologize.

"The Court: You are distressing the witness. You are visibly upsetting her. And it is—

"[Defense Counsel]: May I make a—

"The Court: You may comment when I'm finished and not until.

"[Defense Counsel]: Yes, Your Honor.

"The Court: It is unseemly in the extreme, having upset the witness, visibly, to then repeat a question that I have sustained an objection to. Do not ever do it again."

The defendant refers to *Cameron* v. *Cameron*, 187 Conn. 163, 444 A.2d 915 (1982), in support of his argument that the court so abused its discretion that it prejudiced him. In *Cameron*, an issue developed at trial about $4000 that the defendant allegedly had failed to include in his financial affidavit. Id., 164. In the course of resolving this discrepancy, the trial court accused the defendant and his attorney of tampering with evidence and "perpetrating or attempting to perpetrate a fraud upon [the] [c]ourt"; (internal quotation marks omitted) id., 165; made derogatory comments about the defendant's attorney and some of his prior clients, stated several times that the defendant had lied under oath and, subsequently, held both the defendant and counsel in contempt of court. Id., 164–68. Our Supreme Court stated that the trial court had expressed by its conduct "a preconceived view of the credibility of a witness who had not yet testified before the trier and an attitude of skepticism concerning any person represented by his counsel [that] must have been devastating to the defendant and astounding to any observer schooled in the simple faith that the court is an instrument of justice." Id., 170. Concluding that the situation "inevitably raise[d] in the minds of litigants . . . a suspicion as to the fairness of the court's administration of justice"; (internal quotation marks omitted) id., 171; the Supreme Court held that the trial court's conduct toward the defendant and his counsel created the appearance of partiality and that the trial judge sua sponte should have ordered a mistrial. Id.

We find *State* v. *Gordon*, 197 Conn. 413, 426, 504 A.2d 1020 (1985), to be more applicable to the facts of this case. In *Gordon*, our Supreme Court concluded that the trial court's actions, while questionable, did not deny the defendant a fair trial. In reaching its conclusion, the court noted that the record was replete with instances of argumentative conduct toward defense

counsel. Id., 425. The court reasoned, however, that the trial court's allegedly improper treatment of defense counsel did not thwart defense counsel's ability to defend his client, as counsel zealously argued numerous motions, fully cross-examined all witnesses and was not constrained in his attempts to have evidence admitted or in his ability to object to actions of the state's attorney. Id., 426; see also *United States* v. *Pisani*, 773 F.2d 397, 403 (2d Cir. 1985) (although some of trial judge's comments and behavior toward defense counsel were regrettable, they did not convey impression of partiality toward government to such extent that it became factor in jury deliberations).

In this case, the court's response to defense counsel's questioning arguably was more emphatic than the situation required, but not to the extent that we can conclude that the court exceeded its authority.[22] Our review of the transcript and the audiotape[23] of that portion of the trial reveals that the court had raised its voice at defense

[22] The defendant urges us to reach a different conclusion by juxtaposing the court's reprimand of defense counsel with its subsequent admonishment of the prosecutor. We are not persuaded. Moments after the court's reprimand of defense counsel, the witness was excused from the courtroom, and the following colloquy occurred:

"The Court: Now what did you want to put on the record?

"[Defense Counsel]: Yes, Your Honor. We have reason to believe that the defendant is an unstable personality.

"[The Prosecutor]: I knew that.

"The Court: I'm sorry? What did you say?

"[Defense Counsel]: The victim. The victim is an un—I misspoke. I misspoke.

"[The Prosecutor]: He said, 'the defendant.'

"The Court: Oh, and then you said, 'I knew that.'

"[The Prosecutor]: Yes.

"The Court: All right. Well, if you want to join [defense counsel] in the penalty box—

"[The Prosecutor]: I apologize, Your Honor.

"The Court:—you're welcome to try."

[23] Upon the motion of defense counsel, an audiotape of the relevant portion of the trial was admitted as an exhibit.

counsel. The court's language and tone, however, demonstrate that it neither "lost control" nor verbally "attacked" defense counsel. Moreover, the defendant does not claim, and the record does not show, that the court's reproach, in fact, had limited defense counsel's ability to cross-examine the witness fully or otherwise to maintain a vigorous and thorough defense of his client.[24] We conclude, therefore, that the court's actions did not rise to the level of judicial misconduct such that they prejudiced the defendant and denied him a fair trial.

We find even less persuasive the defendant's argument that the court demonstrated bias toward the witness by offering her a cup of water. We address this claim only to note that the record reflects that the witness had been coughing at the time the court interrupted defense counsel's cross-examination.

The defendant's final argument merits little discussion. The record reveals that the court's "skepticism" about a particular line of defense counsel's questions was, in fact, its ruling sustaining the state's objection, on the basis of relevance, to that line of questioning. The defendant essentially complains that the court's evidentiary ruling demonstrated its partiality on the sole ground that the ruling was unfavorable to the defendant.[25] We disagree. Accordingly, we conclude that the court's conduct during the defendant's cross-examination of the witness resulted in no injustice to the defendant.

[24] Accordingly, the defendant's reliance on State v. Gionfriddo, 154 Conn. 90, 221 A.2d 851 (1966), is inapposite. In Gionfriddo, our Supreme Court held that the trial court's repeated interruptions and rebukes of counsel in the presence of the complainants had the effect of repressing counsel's attack on the credibility of the witnesses and, therefore, denied the defendant the right to cross-examine them. Id., 96–97.

[25] Even if we assume that the court's "skepticism" was evident, we reiterate that there was no jury in this case to be influenced by the court's manner in ruling on the state's objection. See State v. Fernandez, supra, 198 Conn. 11–12; see also Jackson v. United States, supra, 329 F.3d 895.

## III

The defendant next claims that the court improperly admitted certain evidence of prior uncharged misconduct. Specifically, the defendant claims that the court improperly admitted the testimony of two witnesses, L and M, as evidence of the defendant's intent to deliver a controlled substance to the victim and to kidnap and assault her.[26] The defendant argues that the testimony was inadmissible because (1) it did not prove sufficiently that the prior misconduct, in fact, had occurred and (2) even if the testimony was sufficient to prove the prior misconduct, that prior misconduct was not probative of his intent.[27] We are not persuaded.

The following additional facts are relevant to the defendant's claim. During its case-in-chief, the state offered testimony from L, another former coworker of the defendant. L testified that one evening in early August, 2001, she accompanied the defendant after work to a bar. At the bar, the defendant offered to buy

---

[26] Following argument on the defendant's motion in limine, the court admitted the challenged evidence as to counts one, two and three only. As previously noted, the court subsequently acquitted the defendant on count one, kidnapping in the first degree.

[27] The defendant, in a footnote in his appellate brief, also states that the prior misconduct testimony was more prejudicial than probative but does not provide any further analysis of this claim. "[W]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . We will not review claims absent law and analysis." (Internal quotation marks omitted.) State v. Perez, 78 Conn. App. 610, 646, 828 A.2d 626 (2003), cert. denied, 271 Conn. 901, 859 A.2d 565 (2004). Accordingly, we deem the defendant's claim abandoned and decline to afford it review.

The defendant further argues that the court admitted improperly the testimony of the two witnesses as evidence of a common plan or scheme. Because we conclude that the evidence was properly admitted on the issue of the defendant's intent, we need not decide whether the evidence also was probative of a common plan or scheme. See State v. John G., 100 Conn. App. 354, 364 n.9, 918 A.2d 986, cert. denied, 283 Conn. 902, 926 A.2d 670 (2007).

her an alcoholic beverage. She declined and, instead, requested ginger ale, which the defendant brought her. After playing pool for awhile and drinking the ginger ale, L started to feel hot. She interrupted their game to get a glass of water and sat down at the bar.

At the insistence of the defendant, L, who was taking medication at the time, joined him in a couple shots of tequila. The warm feeling that L had experienced continued, and she started to feel disoriented. She excused herself to go to the bathroom but had difficulty walking there. After spending an extended period of time in the bathroom, she began to feel nauseated and asked the defendant to take her home.

At approximately 7:30 p.m., L and the defendant left the bar in the defendant's car. As they drove, L vomited and passed out in the car. Instead of taking her home, the defendant took L to his apartment where she spent the night on his floor. Sometime during the night, she awoke briefly but could not move her arms or legs. The defendant eventually took L home at approximately 8:30 a.m. the next day. Prior to this incident, L never had experienced such an adverse reaction to ginger ale or tequila.

The state next called M, who testified that she began working with the defendant in September, 2001, and, shortly thereafter, started dating him. On their first date, the defendant picked up M at her house and took her to a restaurant. At the restaurant, the defendant ordered M a drink, a cosmopolitan, which she only partially consumed. After they ate dinner, they walked to another place nearby, where the defendant purchased a shot of tequila for M. She drank some, but not all, of the tequila.

At approximately 11 p.m., M called her babysitter to inform the babysitter that she would be home within twenty or thirty minutes because the date was ending. As she was on the telephone, the defendant brought

her a bottle of beer. M drank some of the beer and began to feel hot and dizzy. The next thing she remembers is waking up the following morning alone in the defendant's bed with her shirt partially unbuttoned and her underpants and nylons removed.[28] The defendant took M home later that morning.

About one week later, the defendant admitted to M that he had had sex with her but stated that it was consensual. The defendant opined during this conversation that she must have blacked out from her medication's interaction with the alcohol. M continued for several months to have a sexual relationship with the defendant until December, 2001, and again, briefly, in the spring of 2004.

"As a general rule, evidence of a defendant's prior crimes or misconduct is not admissible. . . . We have, however, recognized exceptions to the general rule if the purpose for which the evidence is offered is to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime. . . . [Prior misconduct] evidence may also be used to corroborate crucial prosecution testimony. . . . Moreover, we have held that such evidence may be used to complete the story of the crime on trial by placing it in the context of nearby and nearly contemporaneous happenings. . . .

"To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. . . . First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such

---

[28] M testified that she had been prescribed medication at the time she began dating the defendant but that she had not taken her medication on the day of this incident. One side effect of her medication was dizziness, which may be intensified by alcohol. According to M, however, she has consumed similar amounts of alcohol with her medication, but never has experienced a loss of memory from doing so.

evidence must outweigh the prejudicial effect of the other crime evidence." (Internal quotation marks omitted.) *State* v. *Colon,* 272 Conn. 106, 332, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005); *State* v. *Epps,* 105 Conn. App. 84, 92–93, 936 A.2d 701 (2007), cert. denied, 286 Conn. 903, 943 A.2d 1102 (2008).

With respect to the first prong, "[r]elevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Nunes,* 260 Conn. 649, 685–86, 800 A.2d 1160 (2002) "[B]efore such evidence can have *any* probative value, [however] there must be a preliminary showing sufficient to support a jury finding that the defendant, in fact, caused the prior injury. The evidence of causation may be circumstantial or direct." (Emphasis in original.) *State* v. *Wilson,* 199 Conn. 417, 449, 513 A.2d 620 (1986).

Our standard of review on such matters is well established. "The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice

appears to have been done." (Internal quotation marks omitted.) *State* v. *Colon,* supra, 272 Conn. 333; *State* v. *Epps,* supra, 105 Conn. App. 93.

We begin our analysis by noting that the testimony by L and M was sufficient direct and circumstantial evidence to support a finding that the defendant had, in fact, committed the prior acts. The testimony of L and M reasonably permitted the inferences that (1) the defendant intentionally had administered alcoholic beverages to them that contained a controlled substance, (2) the controlled substance, as opposed to the alcohol or their prescription medications, rendered them unconscious and (3) the defendant had restrained their movement by carrying them to his apartment, rather than to their respective residences. Compare *State* v. *Nunes,* supra, 260 Conn. 688–89 (prior misconduct testimony reasonably permitted inference that beverage, administered to witness by defendant, contained substance that rendered her physically helpless, despite lack of additional evidence as to identity of substance), with *State* v. *Wilson,* supra, 199 Conn. 449 (prior misconduct testimony not admissible where record completely lacking in evidence as to how or by whom injuries were caused).

The defendant argues that even if the testimony is sufficient proof of the prior misconduct, the prior misconduct demonstrates only his propensity to have criminal intent. He asserts, therefore, that such propensity evidence is not relevant to the issue of his state of mind during his interactions with the victim because it violates the general rule prohibiting evidence of prior misconduct. We disagree.

On the basis of the prior misconduct testimony, the court reasonably could have concluded that the defendant was familiar with, and had access to, controlled substances, specifically, controlled substances that

cause physical impairment. From there, the court logically could have inferred, not on the basis of his propensities but on the basis of his familiarity with controlled substances, that the defendant had delivered MDA to the victim intentionally, rather than by accident or mistake.[29] Accordingly, the court did not abuse its discretion by allowing L and M to testify as to the defendant's prior misconduct.

## IV

The defendant's final claim is that his conviction of delivery of a controlled substance, assault in the second degree and sexual assault in the third degree violated the double jeopardy clause of the United States constitution. Specifically, he argues that the court should have merged the conviction of those three crimes because under the facts of this case, he could not have committed assault in the second degree in the manner alleged by the state without first committing delivery of a controlled substance, and he could not have committed sexual assault in the third degree without first committing assault in the second degree in the manner alleged by the state. In other words, he claims that counts two and three were lesser offenses included in count seven. In support of his claim, the defendant invites this court to reject our Supreme Court's long-standing approval of the rule set forth in *Blockburger* v. *United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932). We decline the defendant's invitation and, applying a *Blockburger* analysis, hold that the court properly convicted the defendant of three separate offenses.[30]

---

[29] Although the defendant did not contend that he accidentally or mistakenly had given the victim a controlled substance, the state nonetheless was required to prove his intent to the court. See *State* v. *Bryant*, 106 Conn. App. 97, 105 n.5, 940 A.2d 858, cert. granted on other grounds, 287 Conn. 905, 950 A.2d 1282 (2008).

[30] Even if we were inclined to accept the defendant's invitation, he has offered no argument that the Connecticut constitution requires a more protective test than the *Blockburger* test. See footnote 10 of this opinion. Further, we note that "[t]he constitution of Connecticut does not contain an

We note at the outset that the defendant's claim raises a question of law over which we exercise plenary review. See *State* v. *Culver*, 97 Conn. App. 332, 336, 904 A.2d 283, cert. denied, 280 Conn. 935, 909 A.2d 961 (2006). "The fifth amendment to the United States constitution provides in relevant part: No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . . The double jeopardy clause of the fifth amendment is made applicable to the states through the due process clause of the fourteenth amendment. *Benton* v. *Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969). Although the Connecticut constitution has no specific double jeopardy provision, we have held that the due process guarantees of [the Connecticut constitution] include protection against double jeopardy. . . .

"[Our Supreme Court has] recognized that the Double Jeopardy Clause consists of several protections: It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." (Internal quotation marks omitted.) *State* v. *Bletsch*, 281 Conn. 5, 27, 912 A.2d 992 (2007). "Double jeopardy analysis in the context of a single trial is a two-step process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met." (Internal quotation marks omitted.) *State* v.

___

express prohibition against double jeopardy. Instead, [our Supreme Court] repeatedly ha[s] held that the due process guarantees, presently encompassed in article first, § 8, of the Connecticut constitution, include protection against double jeopardy . . . [and] that the absence of an explicit constitutional double jeopardy provision strongly suggests that the incorporated common-law double jeopardy protection mirrors, rather than exceeds, the federal constitutional protection." (Citations omitted; internal quotation marks omitted.) *State* v. *Bletsch*, 281 Conn. 5, 9 n.4, 912 A.2d 992 (2007).

*Moore*, 100 Conn. App. 122, 140, 917 A.2d 564 (2007). "One may, however, when the legislature authorizes, be convicted of multiple offenses even though the offenses arise from the same conduct. *Missouri* v. *Hunter*, 459 U.S. 359, 367–68, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983)." *State* v. *Quint*, 97 Conn. App. 72, 78, 904 A.2d 216, cert. denied, 280 Conn. 924, 908 A.2d 1089 (2006). "[T]he issue, though essentially constitutional, becomes one of statutory construction." (Internal quotation marks omitted.) *State* v. *Culver*, supra, 97 Conn. App. 337.

The defendant claims that the court's sentence violated his protection against multiple punishments for the same offense. "[Our Supreme Court has] applied the *Blockburger* test to determine whether two statutes criminalize the same offense, thus placing a defendant prosecuted under both statutes in double jeopardy: [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. . . . This test is a technical one and examines only the statutes, charging instruments, and bill of particulars as opposed to the evidence presented at trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Bletsch*, supra, 281 Conn. 27–28. "[I]f two offenses stand in the relationship of greater and lesser included offense, [however] then [t]he greater offense is . . . by definition the same for purposes of double jeopardy as any lesser offense included in it." (Internal quotation marks omitted.) *State* v. *Moore*, supra, 100 Conn. App. 139.

"Our analysis of double jeopardy claims does not end, however, with a comparison of the offenses. The *Blockburger* test is a rule of statutory construction, and because it serves as a means of discerning [legislative] purpose the rule should not be controlling where, for

example, there is a clear indication of contrary legislative intent." (Internal quotation marks omitted.) *State* v. *Kirsch*, 263 Conn. 390, 421–22, 820 A.2d 236 (2003).

The defendant claims that as alleged in the information, the charge of delivery of a controlled substance was a lesser offense included within the greater offense of assault in the second degree. He argues that proof of assault in the second degree, as charged by the state, first required proof of all the facts necessary to convict him of delivery of a controlled substance.

In order to convict the defendant of assault in the second degree under § 53a-60 (a) (4), the state was required to prove, as it had alleged in its long form information, that he (1) intentionally (2) had caused stupor, unconsciousness or other physical impairment or injury to another person (3) by administering to such person (4) a drug, substance or preparation capable of producing the same (5) without her consent (6) for a purpose other than lawful medical or therapeutic treatment. In order to convict the defendant of delivery of a controlled substance under § 21a-277 (b), the state was required to prove, as it had alleged in its long form information, that he (1) administered to another person (2) any controlled substance, except a narcotic substance, or a hallucinogenic substance other than marijuana.

The defendant's argument overlooks the possibility that the state could have proven assault in the second degree with evidence that he had administered a narcotic substance capable of producing stupor, unconsciousness or other physical impairment or injury to the victim. The administration of a narcotic substance would not have supported a conviction under § 21a-277 (b).[31]

---

[31] We note that the defendant, on March 14, 2006, filed a motion for a bill of particulars in which he requested that the court order the state to declare, inter alia, "the exact 'drug, substance or preparation' " that provided the basis for the charge of assault in the second degree and "the exact 'controlled

Likewise, the defendant claims that as alleged in the information, the charge of assault in the second degree was a lesser offense included within the greater offense of sexual assault in the third degree. The defendant argues that proof of sexual assault in the third degree, as charged by the state, first required proof that he had applied force by way of a "substance which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or serious physical injury . . . ." General Statutes § 53a-3 (7); see General Statutes § 53a-65 (7).

In order to convict the defendant of sexual assault in the third degree under § 53a-72a (a) (1) (A), the state was required to prove, as it had alleged in its long form information, that he (1) had compelled another person to submit to sexual contact (2) by the use of force against such other person or a third person. The defendant's argument ignores the possibility that the state could have proven sexual assault in the third degree with evidence that the defendant had used "actual physical force or violence or superior physical strength against the victim"; General Statutes § 53a-65 (7); without proof that he administered a drug. Such evidence would not have supported a conviction under § 53a-60 (a) (4). Accordingly, we conclude that the defendant's conviction does not violate the constitutional prohibition against double jeopardy. Our review of the relevant statutes has indicated no clear legislative intent to the contrary. See *State* v. *Kirsch*, supra, 263 Conn. 421–22.

The judgment is affirmed.

In this opinion the other judges concurred.

---

substance' " that provided the basis for the charge of delivery of a controlled substance. The court denied the defendant's motion for a bill of particulars, and the defendant has not challenged that ruling on appeal.